# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF IOWA
# CENTRAL DIVISION

| | |
|---|---|
| GARY ALEX CARLSON, <br><br> Plaintiff, <br><br> vs. <br><br> COMMISSIONER OF SOCIAL SECURITY,[1] <br><br> Defendant. | No. 3:17-CV-03052-KEM <br><br><br> **MEMORANDUM OPINION AND ORDER** |

Plaintiff Gary Alex Carlson seeks judicial review of a final decision of the Commissioner of Social Security (the Commissioner) denying his applications for supplemental security income (SSI) benefits under Title XVI of the Social Security Act, 42 U.S.C. §§ 1381-1383f, and for disability insurance (DI) benefits under Title II of the Social Security Act, 42 U.S.C. §§ 401-434. Carlson argues that the Commissioner erred in evaluating his subjective complaints of his symptoms, in giving little weight to the medical opinions of Carlson's treating physician and of a consultative examiner, and in posing hypothetical questions to a vocational expert (VE). I recommend **reversing** the Commissioner's decision and **remanding** for further proceedings.

---

[1] Nancy Berryhill is no longer the Acting Commissioner of Social Security, although she still leads that agency as the Deputy Commissioner. *See Edwards v. Comm'r of Soc. Sec*, No. 7:17-CV-00052-RN, 2018 WL 1413974, at *1 n.1 (E.D.N.C. Mar. 21, 2018). I substitute the Commissioner of Social Security for Ms. Berryhill in accordance with Federal Rules of Civil Procedure 17(d) and 25(d). *See also, e.g.*, *Gates v. Comm'r, Soc. Sec. Admin.*, 721 F. App'x 575 (8th Cir. 2018) (per curiam); *Stanley v. Comm'r, Soc. Sec. Admin.*, 720 F. App'x 818 (8th Cir. 2018) (per curiam); *Shelton v. Comm'r, Soc. Sec. Admin*, 716 F. App'x 574 (8th Cir. 2018) (per curiam).

## I.     BACKGROUND[2]

In the early 1990s, Carlson underwent seven surgeries on his right shoulder from a work-related accident. AR 104, 467;[3] Doc. 2 at 11. He eventually recovered and returned to work (in the construction field) with no restrictions. *Id.* In 2005, he injured his left shoulder and underwent two surgeries. AR 467; Doc. 2 at 11. He did not return to work after this injury until March 2008. AR 285, 467. He worked for about seven months, but in November 2008, Carlson injured his right shoulder again while working, and he has not engaged in substantial gainful activity since (although he has made unsuccessful work attempts). AR 33, 137, 285, 467. In July 2009, Carlson had another right-shoulder surgery. AR 478-81. On March 2, 2010, he filed applications for DI and SSI benefits, alleging disability since his November 2008 shoulder injury. AR 130-132. These claims were denied initially and upon reconsideration on November 2, 2010, and became final when Carlson failed to request a hearing before an ALJ. AR 30, 130-132.

In August 2013, Carlson re-injured his right shoulder while working on a drywall project. AR 758. Because of this injury, Carlson underwent another surgery for his right shoulder on October 18, 2013. AR 880-85. Dr. Lisa Kapler, MD, became Carlson's treating physician following the October 2013 surgery, seeing Carlson for the first time on January 10, 2014.[4] AR 37, 1121.

---

[2] For a more thorough overview, see the Joint Statement of Facts (Doc. 11).

[3] "AR" refers to the administrative record below.

[4] Carlson had previously received treatment from the People's Clinic, but he had expressed frustration that the providers there refused to prescribe him narcotics for his pain after he tested positive for hydrocodone in August 2011 (which they had not prescribed) while prescribed morphine, in violation of his pain contract. AR 796, 800-01, 805, 808.

Dr. Kapler's treatment notes include numerous reports of right shoulder pain in 2014 and 2015, and Dr. Kapler prescribed various pain medications during this time in an attempt to control Carlson's pain. *See, e.g.*, AR 929, 967, 975, 1069, 1083. Dr. Kapler also prescribed Carlson medications for sleep difficulties and mental impairments, including depression, bipolar disorder, and anxiety. *See, e.g.*, AR 909, 929, 942, 992, 1018, 1061.

Carlson filed a DI claim on July 30, 2013, and an SSI claim on November 5, 2013, alleging disability beginning on July 12, 2009 (although his attorney recognized at the hearing that due to the finality of his prior denial, "we can only go back to" November 3, 2010, the day after his initial disability claim was denied). AR 30, 97, 136. Both of Carlson's disability claims were denied initially on October 28, 2013, and then again on reconsideration on March 7, 2014. AR 135-77. In connection with the determination on reconsideration, the Social Security Administration ordered a consultative examination. AR 152, 168. Dr. Michael Henderson, DO, performed this one-time examination of Carlson on March 4, 2014, to determine his physical limitations. AR 900-02.

On April 28, 2014, Carlson filed a written request for a hearing before an ALJ. AR 30, 207. The hearing occurred on July 29, 2015, with the ALJ appearing in West Des Moines, Iowa, and Carlson appearing via videoconference from Waterloo, Iowa. AR 30, 93. Carlson testified personally about his limitations and history of pain. AR 93-121. Melinda Starr, a VE, also testified and answered questions posed by the ALJ regarding whether a hypothetical person with specified limitations could perform Carlson's past work and work in the national economy. AR 91-92, 121-28.

On October 22, 2015, the ALJ issued a written opinion and found Carlson had "not been under a disability . . . from November 3, 2010, through [October 22, 2015]."

3

The ALJ followed the five-step process outlined in the regulations[5] to deny Carlson's applications for disability benefits. AR 30-41. At step one, the ALJ found that Carlson had not engaged in substantial gainful activity since November 2010. AR 33. Although the ALJ recognized that Carlson had "tried painting . . . for a couple months" in 2011, the ALJ found this to be an unsuccessful work attempt, since Carlson reported being unable to continue the painting job "due to arm[] and back pain." *Id.* At step two, the ALJ found that Carlson suffers from the following severe impairments: "status post shoulder surgeries bilaterally, disorders of the shoulders bilaterally, degenerative disc disease, degenerative joint disease, depressive disorder, and polysubstance abuse disorder (cannabis)." AR 33. At step three, the ALJ found that Carlson's impairments did not meet or equal a listing. AR 33. In making this determination, the ALJ found that Carlson suffered from moderate limitations in concentration, persistence, or pace. AR 34. To evaluate whether Carlson retained the ability to perform his past work (step four) or other work (step five), the ALJ determined Carlson's residual functional capacity (RFC)[6]:

> [Carlson] has the [RFC] to perform light work . . . . Specifically, he is limited to lifting and/or carrying 20 pounds occasionally and 10 pounds frequently; standing and/or walking 6 hours in an 8-hour workday; sitting 6 hours in an 8-hour workday; occasionally pushing/pulling with the right

---

[5] "The five-part test is whether the claimant is (1) currently employed and (2) severely impaired; (3) whether the impairment is or approximates a listed impairment; (4) whether the claimant can perform past relevant work; and if not, (5) whether the claimant can perform any other kind of work." *King v. Astrue*, 564 F.3d 978, 979 n.2 (8th Cir. 2009); *see also* 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). The burden of persuasion always lies with the claimant to prove disability, but during the fifth step, the burden of production shifts to the Commissioner to demonstrate "that the claimant retains the RFC to do other kinds of work[] and . . . that other work exists." *Goff v. Barnhart*, 421 F.3d 785, 790 (8th Cir. 2005) (quoting *Eichelberger v. Barnhart*, 390 F.3d 584, 591 (8th Cir. 2004)).

[6] RFC is "'what the claimant can still do' despite his or her physical or mental limitations." *Lewis v. Barnhart*, 353 F.3d 642, 646 (8th Cir. 2003) (quoting *Bradshaw v. Heckler*, 810 F.2d 786, 790 (8th Cir. 1987)).

upper extremity; never climbing ladders, ropes, or scaffolds; occasionally climbing of ramps and stairs, crawling, balancing, stooping, kneeling, and crouching; occasionally reaching overhead with the bilateral upper extremities; frequently reaching in the front and/or laterally with the bilateral upper extremities, but not constantly, and within the limits of lifting restrictions; occasional exposure to extreme cold, humidity, and vibration; and performing simple, routine, repetitive tasks.

AR 35. Although the ALJ recognized that "[Carlson's] medically determinable impairments could reasonably be expected to cause some of the alleged symptoms," the ALJ did not fully credit Carlson's subjective complaints regarding his physical and mental limitations and his complaints of pain. AR 36. The ALJ also gave little weight to Dr. Henderson's opinion of Carlson's limitations. AR 38. The ALJ determined Carlson's RFC prevented him from performing his past relevant work, but the ALJ found there were other jobs in the national economy that he could perform. AR 39-40.

Following the ALJ's denial of disability benefits, Carlson filed an appeal to the Appeals Council on December 16, 2015. AR 26. In connection with the request for review, Carlson submitted an RFC opinion formulated by Dr. Kapler on February 25, 2016. AR 5, 249, 1153-59. The Appeals Council granted review solely to consider Dr. Kapler's opinion, and on April 3, 2017, the Appeals Council issued a written opinion affirming the ALJ's determination that Carlson was not disabled and adopting the ALJ's findings in their entirety.[7] AR4-6, 249. The Appeals Council gave little weight to Dr. Kapler's opinion. AR 5.

Carlson filed a timely appeal in this court on June 1, 2017. Doc. 2. The parties briefed the issues (Docs. 12, 13, 14) and consented to the jurisdiction of a United States magistrate judge (Doc. 6).

---

[7] I thus refer to the ALJ's decision when discussing the Commissioner's final decision, except for the discussion of the weight to assign Dr. Kapler's opinion.

## II. DISCUSSION

A court must affirm the Commissioner's decision if it "is supported by substantial evidence in the record as a whole." *Kirby v. Astrue*, 500 F.3d 705, 707 (8th Cir. 2007); see also 42 U.S.C. § 405(g). "Substantial evidence is less than a preponderance, but enough that a reasonable mind might accept it as adequate to support a decision." *Kirby*, 500 F.3d at 707. The court "do[es] not reweigh the evidence or review the factual record de novo." *Naber v. Shalala*, 22 F.3d 186, 188 (8th Cir. 1994). If, after reviewing the evidence, "it is possible to draw two inconsistent positions from the evidence and one of those positions represents the [Commissioner's] findings, [the court] must affirm the decision." *Robinson v. Sullivan*, 956 F.2d 836, 838 (8th Cir. 1992).

Carlson asks the Court to review whether (1) the ALJ erred in evaluating Carlson's subjective allegations of his symptoms; (2) the Appeals Council erred by giving little weight to Dr. Kapler's medical opinion; (3) the ALJ erred by giving little weight to Dr. Henderson's medical opinion; and (4) the ALJ erred in posing hypothetical questions to the VE at the hearing.

### A. *Subjective Complaints*

Carlson argues the ALJ erred by not giving full weight to his subjective complaints of pain. Doc. 12 at 6-12. When evaluating the weight to assign a claimant's subjective complaints—including pain—the ALJ must consider the factors set forth in *Polaski v. Heckler*: "(1) the claimant's daily activities; (2) the duration, frequency and intensity of the pain; (3) dosage, effectiveness, and side effects of medication; (4) precipitating and aggravating factors; and (5) functional restrictions." *Black v. Apfel*, 143 F.3d 383, 386 (8th Cir. 1998); *accord Polaski*, 739 F.2d 1320, 1321-22 (8th Cir. 1984), *vacated*, 476

U.S. 1167 (1986), *reinstated*,[8] 804 F.2d 456 (8th Cir. 1986). Other relevant factors include "treatments or other methods [the claimant] uses to alleviate [symptoms]," 20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3); "the claimant's relevant work history[;] and the absence of objective medical evidence to support the complaints." *Black*, 143 F.3d at 386. The ALJ may not discredit the claimant's allegations based solely on the absence of objective medical evidence, but the ALJ may rest her credibility finding on "objective medical evidence to the contrary," *Ramirez v. Barnhart*, 292 F.3d 576, 581 (8th Cir. 2002); or "inconsistencies in the record as a whole," *Brockman v. Sullivan*, 987 F.2d 1344, 1346 (8th Cir. 1993). Courts must "defer to an ALJ's credibility finding as long as the 'ALJ explicitly discredits a claimant's testimony and gives a good reason for doing so.'" *Schultz v. Astrue*, 479 F.3d 979, 983 (8th Cir. 2007) (quoting *Hogan v. Apfel*, 239 F.3d 958, 962 (8th Cir. 2001)). "The ALJ [i]s not required to discuss methodically each *Polaski* consideration, so long as [she] acknowledge[s] and examine[s] those considerations before discounting [the claimant's] subjective complaints." *Lowe v. Apfel*, 226 F.3d 969, 972 (8th Cir. 2000).

The ALJ considered Carlson's testimony regarding his subjective complaints of physical pain and limitations. AR 36. Carlson testified that problems with both of his shoulders left him unable to work. AR 36, 101, 103-05. Carlson claimed that he could lift twenty to thirty pounds with both hands one time, but not repetitively, and that he would have difficulty lifting a gallon of milk with one hand. AR 36,105-06. Carlson testified he was unable to reach overhead. AR 36, 112. Carlson said he walks with a limp following knee and foot surgery, and he can only walk about eight city blocks before

---

[8] The court did not explicitly say that it was reinstating the original *Polaski* opinion, but the Eighth Circuit has recognized that it "effectively reinstat[ed]" *Polaski*. *Jones v. Callahan*, 122 F.3d 1148, 1151 n.3 (8th Cir. 1997).

needing to rest for a few hours until walking again. AR 36, 108. He claimed he needs to change positions a lot when he is sitting. AR 36, 110-11. Carlson testified that cold and wet conditions can "cripple" him. AR 36, 111. He claimed his condition continues to deteriorate. *Id*. The ALJ held the "intensity, persistence and limiting effects" of Carlson's alleged impairments were inconsistent with the medical record and Carlson's activities of daily living. AR 36, 37.

The ALJ noted that "[Carlson's] medically determinable impairments could reasonably be expected to cause some of the alleged symptoms" but decided "[Carlson's] statements concerning the intensity, persistence[,] and limiting effects of [his] symptoms are not entirely credible." AR 36. The ALJ compared Carlson's subjective complaints of his physical limitations with the medical treatment records, finding that the treatment records did not fully support his complaints. AR 36-37. Substantial evidence supports this conclusion. The treatment records reflect that Carlson primarily complained of right shoulder pain and rarely complained of some of the other physical ailments he testified to, such as knee and foot pain.[9] The ALJ also noted that despite Carlson's testimony that

---

[9] *See* AR 697 (November 2011: emergency room visit for right shoulder pain); AR 799-800 (February 2012: office visit where Carlson reports pain in shoulders, right worse than left, and that he "might need a referral" for his right knee); AR 795 (February 2012: office visit for right shoulder pain); AR 843-44 (August 2013: office visit where Carlson complains of right shoulder pain and tingling in toes that makes it difficult to wear shoes); AR 672-73 (August 2013: emergency room visit for right shoulder pain); AR 758, 865-86 (August through October 2013: appointments with specialist regarding right shoulder pain; surgery performed on right shoulder); AR 861 (October 2013: appointment with nutritionist regarding occasional prediabetes tingling and numbness in toes); AR 992-93 (January 2014: office visit for prediabetes and related "[p]ainful sensation in feet"); AR 1109 (January 2014: phone call to primary care provider complaining of shoulder pain); AR 892-93 (March 2014: consultative examination where Carlson "cites his recent [right] shoulder surgery as the only factor that he feels limits or affects his ability to work"; he reports his other medical conditions include "a feeling as if his shoes are too tight" and being unable to "depend on his right knee 100%"); AR 900 (March 2014: consultative examination where Carlson reports that the only impairment preventing him from working is his right shoulder; he also reports suffering from left shoulder pain, difficulties with

his condition continues to deteriorate, the most recent treatment notes in the record (from February to June 2015) reflect that his pain was "well controlled with current [medications]" or otherwise that his current medications were simply refilled (AR 929, 939, 1019-21). The ALJ also noted that treatment records from the consultative examiners reflect a normal gait with no limp, despite Carlson's testimony that he walked with a limp[10] (one consultative examiner also noted "somewhat stiff movements"). AR 895, 901. Although Carlson reported being unable to walk more than eight blocks, treatment records from June 2015 reflect that he has no problems "with walking or with balance" and that he reported being able to walk at least ten blocks (but not an unlimited amount) in January 2014 (as well as reporting being able to climb stairs and exercise). AR 923, 993. Although the treatment notes tend to support that Carlson suffers limitations related to his right shoulder, they do not support his testimony about many

---

his right knee, and "some low back pain from an old injury that makes it difficult to sit"); AR 1096 (March 2014: office visit complaining of shoulder pain (unclear if both shoulders or just right shoulder)); AR 1083 (April 2014: same); AR 1069 (April 2014: office visit complaining of right shoulder pain); AR 982 (April 2014: same); AR 975 (September 2014: office visit complaining of bilateral shoulder pain); AR 967 (September 2014: office visit complaining that pain is "not as well controlled as [Carlson] would like" (unclear what part of body is in pain)); AR 1039 (October 2014: office visit complaining of pain in both shoulders); AR 949, 1010, 1037 (November 2014: phone call, office visit, and emergency room visit complaining of testicular pain and low back pain); AR 1023 (February 2015: office visit complaining of pain in both shoulders after Carlson injured his left shoulder rolling over on the couch); AR 939 (May 2015: office visit complaining of continuing bilateral shoulder pain); AR 929 (June 2015: office visit complaining of pain in shoulders); AR 915 (June 2015: office visit complaining primarily of mental-health problems, but treatment notes reflect Carlson's anxiety and depression are associated with chronic pain in "shoulders, lumbar area, [and] knees"); AR 909 (July 2015: office visit for mental health and chronic pain; treatment records reflect no notes were taken under "chronic pain").

[10] I note, however, that at the hearing in July 2015, Carlson testified to walking with a limp after knee and foot surgery, and it is not entirely clear when this surgery occurred, as the treatment notes do not seem to be in the record.

other limitations. Substantial evidence supports the ALJ's determination to discount Carlson's subjective complaints based on inconsistencies with the treatment records.

Although I affirm the ALJ's decision to discount Carlson's subjective complaints, I note that Carlson's activities of daily living reported in function reports are not necessarily inconsistent with his complaints of physical pain and limitations, as suggested by the ALJ. AR 37. "Significant daily activities may be inconsistent with claims of disabling pain," *Guilliams v. Barnhart*, 393 F.3d 798, 802 (8th Cir. 2005), but "a claimant need not prove she is bedridden or completely helpless to be found disabled," *Reed v. Barnhart*, 399 F.3d 917, 923 (8th Cir. 2005) (quoting *Thomas v. Sullivan*, 876 F.2d 666, 669 (8th Cir. 1989)). SSR 85-16 provides "that 'consideration should be given to . . . the quality of daily activities . . . and the ability to sustain activities, interests, and relate to others *over a period of time*' and that the 'frequency, appropriateness, and independence of the activities must also be considered.'" *Reed*, 399 F.3d at 922 (cleaned up) (quoting SSR 85-16, 1983-1991 Soc. Sec. Rep. 352 (1985)).

The ALJ found that Carlson's ability "to care for his pets, do his own personal care, prepare meals, do household chores, go shopping, and visit with family" "show that he is more capable than he alleges." AR 37. As support, the ALJ cited Carlson's function report from October 2010, which the ALJ had previously stated she would not consider because it was outside the relevant time period. AR 30, 37. The ALJ also referred to her previous discussion (at step three) of Carlson's activities of daily living as it relates to his mental impairments, in which the ALJ noted Carlson's function reports from September and December 2013 show that Carlson "performs household chores, including laundry, preparing food, and washing dishes[;] . . . . occasionally babys[its] his two grandchildren, ages 6 and 4[;] go[es] out alone, drive[s], and shop[s] in stores[;] . . . . [and] [can] spen[d] all day reading and watching television." AR 34, 37. The ALJ

failed to recognize the "quality" of these daily activities. For example, Carlson reported letting his dog outside to go to the bathroom and providing him with food and water, but he did not report walking the dog. AR 335, 386, 415. Although Carlson reported being able to perform personal-care tasks, he noted that his impairments made it difficult for him to put his shoes and belt on, brush his teeth, and button his pants; that he kept his hair short due to difficulties reaching overhead; and that he is unable to wash certain parts of his body due to shoulder issues. AR 335, 386, 415. He prepares meals that do not require much "fuss[]," such as frozen microwavable meals, cereal, and ramen noodles. AR 336, 386, 388, 416-17. He picks objects up and washes dishes over the course of the day, taking several breaks before completing the entire task, and he has help with household chores from his adult children and from a person he hires to mow and care for the lawn. AR 336, 342-43, 388, 391, 416. He goes shopping, but reported spending only ten minutes to a half hour in stores at a time. AR 337-38, 390, 417, 419. When he watches his grandchildren, he often sits on his deck or porch and watches them bike around. AR 392. These activities of daily living are perhaps inconsistent with Carlson's claimed limitations related to his ability to sit and his ability to function mentally. But, the ALJ seems to have found that these activities of daily living were inconsistent with Carlson's other claimed limitations (including as it relates to his shoulder) and did not recognize the reduced *quality* in Carlson's activities of daily living. It is unclear to me (from the ALJ's opinion and from the record generally) how Carlson's activities of daily living are inconsistent with many of his assertions of pain.

Nevertheless, I find that overall, the ALJ gave good reasons, based on the substantial evidence in the medical records, for the weight assigned Carlson's subjective complaints. Therefore, I affirm the ALJ's decision to not fully credit Carlson's subjective complaints.

## B. Medical Opinions

Carlson argues the Appeals Council erred by assigning little weight to the opinion of Dr. Kapler, his primary care provider. Carlson also argues the ALJ erred by giving little weight to the opinion of one-time consultative examiner Dr. Henderson. When determining a claimant's RFC, the Commissioner considers medical opinions "together with the rest of the relevant evidence." 20 C.F.R. §§ 404.1527(b) 416.927(b).[11] The Commissioner considers the following factors to determine the weight to assign a medical opinion:

> (1) whether the source has examined the claimant; (2) the length, nature, and extent of the treatment relationship and the frequency of examination; (3) the extent to which the relevant evidence, "particularly medical signs and laboratory findings," supports the opinion; (4) the extent to which the opinion is consistent with the record as a whole; (5) whether the opinion is related to the source's area of specialty; and (6) other factors "which tend to support or contradict the opinion."

*Owen v. Astrue*, 551 F.3d 792, 800 (8th Cir. 2008) (quoting the current 20 C.F.R. §§ 404.1527(c), 416.927(c)). "The ALJ [and the Appeals Council] must give 'controlling weight' to a treating [source's] opinion if it 'is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence.'" *Papesh v. Colvin*, 786 F.3d 1126, 1132 (8th Cir. 2015) (quoting *Wagner v. Astrue*, 499 F.3d 842, 848-49 (8th Cir. 2007)); *see also* 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2). "Whether the ALJ [and the Appeals Council] give[]

---

[11] New regulations for evaluating medical opinions went into effect on March 27, 2017, and some, by their terms, apply retroactively. *See* Revisions to Rules Regarding the Evaluation of Medical Evidence, 82 Fed. Reg. 5844 (Jan. 18, 2017). The Eighth Circuit has applied these new rules retroactively, which are substantively the same as the old rules. *See, e.g.*, *Chesser v. Berryhill*, 858 F.3d 1161, 1164 (8th Cir. 2017). I cite to the new 2017 regulations.

the opinion of a treating [source] great or little weight, the ALJ [and the Appeals Council] must give good reasons for doing so." *Reece v. Colvin*, 834 F.3d 904, 909 (8th Cir. 2016).

### *1. Dr. Kapler's Opinion*

Dr. Kapler became Carlson's primary care provider in January 2014. AR 1121. She completed an RFC Questionnaire on February 25, 2016, after the issuance of the ALJ's decision (she had previously expressed reluctance to evaluate Carlson's RFC because "she's not a disability examiner"). AR 41, 95, 1153-59. The Appeals Council considered this additional evidence but assigned little weight to Dr. Kapler's RFC opinion, finding it inconsistent with the record as a whole, including some of Dr. Kapler's own treatment notes. AR 4-5.

Dr. Kapler found that Carlson's symptoms include "pain and decreased range of motion" in both shoulders, his left knee, and his right foot. AR 1155. She noted that "pain in all joints" left him unable to mow the lawn or take out the garbage. AR 1155. Dr. Kapler noted that Carlson could only walk one city block without resting or experiencing severe pain. AR 1156. She found he could stand continuously for no more than ten minutes at one time (and that he could be on his feet less than two hours total in an eight-hour day). AR 1157. She found he could only sit for fifteen minutes at a time, for a total of less than two hours. *Id*. Dr. Kapler opined that Carlson could never lift and carry ten pounds or more and rarely lift and carry under ten pounds; never crouch, squat, or climb ladders; and rarely twist, bend, or climb stairs. AR 1158. Dr. Kapler noted that Carlson's bipolar disorder contributes to his functional limitations. AR 1156. Dr. Kapler concluded that Carlson's pain is serious enough to interfere with his attention and concentration frequently (defined as one-third to two-thirds of an eight-hour day).

AR 1156. Dr. Kapler wrote that the above restrictions had been in place since Carlson's surgery on October 18, 2013. AR 1159.

Substantial evidence supports the Appeals Council's decision to give little weight to Dr. Kapler's opinion based on inconsistencies with her previous medical records and the record as a whole, which is a "good reason" for discounting a treating physician's opinion. *See Martise v. Astrue*, 641 F.3d 909, 925 (8th Cir. 2011) ("[A]n ALJ may justifiably discount a treating physician's opinion when that opinion 'is inconsistent with the physician's clinical treatment notes.'" (quoting *Davidson v. Astrue*, 578 F.3d 838, 843 (8th Cir. 2009))); *House v. Astrue*, 500 F.3d 741, 744-45 (8th Cir. 2007) (affirming the Commissioner's decision to give "little weight" to some of the treating source's opined limitations because they were inconsistent with his treatment notes, as well as the overall record). As noted above when discussing Carlson's subjective complaints, the treatment records (including those from Dr. Kapler) reflect that Carlson primarily complained of right shoulder pain and rarely complained of knee, foot, or other joint pain. Although Dr. Kapler found Carlson extremely limited in his ability to walk since his surgery in October 2013, the Appeals Council noted that one of Dr. Kapler's treatment records from January 2014 reflects that Carlson is able to walk at least ten blocks, exercise, climb stairs, and kneel. AR 993; *see also* AR 923 (Dr. Kapler's treatment note from June 2015 reflects no "problems walking or with balance"). Indeed, even Carlson's testimony at the hearing is inconsistent with Dr. Kapler's opined limitations, as Carlson testified that he could walk eight blocks and that he could lift twenty to thirty pounds with both hands, but not repetitively. AR 105-06, 108-09. Therefore, the Appeals Council did not err in assigning little weight to Dr. Kapler's RFC opinion.

### *2. Dr. Henderson's Opinion*

The ALJ also gave little weight to the opinion of Dr. Henderson, a consultative examiner who met with Carlson once in March 2014 at the request of the Social Security Administration. AR 38, 900-02. Dr. Henderson found no "objective evidence to limit sitting, standing or walking." AR 902. He did impose limitations, however, related to Carlson's use of his right shoulder:

> [T]he right shoulder is limited to working at chest height if close to the body, minimal abduction and should avoid repetitive use. Lifting should be limited to 15 pounds if close to the body. He also is not able to reach, push or pull with the right arm. There are no impairments to fine motor activity.

AR 902. The ALJ believed the limitations from Dr. Henderson's report were inconsistent with the limitations found in the record as a whole and therefore gave little weight to Dr. Henderson's opinion. AR 38. The ALJ gave two reasons for making this determination: (1) Carlson was dry walling in September 2013, indicating his ability to perform physical work, and (2) treatment records reflect Carlson reported improvements with his pain because of pain medications. AR 38.

Although the ALJ is correct that dry walling requires a certain amount of physical ability, the ALJ failed to recognize that Carlson re-injured his shoulder engaging in this activity and had to have another surgery because of it. Treatment records reflect that Carlson went to the emergency room for shoulder pain in August 2013, stating that he "was working at home [and] heard a pop [and] now it hurts." AR 670. Less than a week later, Carlson went to a specialist, reporting "incremental pain for awhile" until his right shoulder "finally snapped" as a result of "working on a dry wall project using a screw gun and pulling tape." AR 758. Because imaging showed Carlson's "recent injury while dry walling" was "consistent with [a] retear" of his shoulder muscle, he had surgery on his right shoulder in October 2013. AR 870, 880. Dr. Henderson issued his RFC

15

opinion—limiting Carlson's use of his right shoulder based in part on "clear evidence of several surgeries"—after Carlson's dry wall injury and subsequent surgery in October 2013. Thus, substantial evidence does not support the ALJ's finding that Carlson's ability to dry wall was inconsistent with Dr. Henderson's RFC opinion. *See also* AR 60 (Carlson reported his arm was "much more limited" since his October 2013 surgery).

The ALJ also relied on the fact that Carlson "reported improvement with pain medications" in giving little weight to Dr. Henderson's opinion. AR 38. First, an improvement of pain with medication is not necessarily inconsistent with ongoing pain or the limitations found by Dr. Henderson. *Cf. Hutsell v. Massanari*, 259 F.3d 707, 712 (8th Cir. 2001) ("We also believe that the Commissioner erroneously relied too heavily on indications in the medical record that [claimant] was 'doing well,' because doing well for the purposes of a treatment program has no necessary relation to a claimant's ability to work or to her work-related functional capacity."). Indeed, here, the ALJ relied on[12] a treatment note from April 2014, in which Carlson reported the pain in his right shoulder was "much better" with an increase in pain medications, and a treatment note from September 2014, in which Carlson reported his pain was "relieved by" medications, but at both of those appointments, Carlson also reported "constant," "aching" pain in his right shoulder that caused "decreased mobility" and that was "aggravated by lifting and moving." AR 36, 1126, 1129. The ALJ also pointed to a normal neurological examination in September 2014 (including normal deep tendon reflexes, normal memory, and intact cranial nerves), but it is unclear how this evidence is inconsistent with the

---

[12] The ALJ only mentioned "the claimant's reported improvement with pain medication" in discussing the weight given to Dr. Henderson's opinion. AR 38. In assessing Carlson's subjective complaints, however, the ALJ discussed Dr. Kapler's treatment notes from April and September 2014 (reporting improved pain) in contrasting Dr. Henderson's observations from March 2014. AR 36.

16

limitations in Carlson's shoulder found by Dr. Henderson (at the consultative examination, Dr. Henderson also observed that Carlson's reflexes were normal, but he had a reduced range of motion in his right shoulder). AR 36, 901-02, 1134. Second, the ALJ cannot rely on one or two treatment notes to support a finding of inconsistency; the ALJ must consider "the record as a whole." *Stormo v. Barnhart*, 377 F.3d 801, 805-06 (8th Cir. 2004) (emphasis added); *cf. Pates-Fire v. Astrue*, 564 F.3d 935, 944 (8th Cir. 2009) (holding that the ALJ could not discount a treating physician's RFC opinion based on an alleged inconsistency with one Global Assessment of Functioning (GAF) score of 58; rather, the ALJ had to consider the claimant's "total GAF score history," which demonstrated only four out of twenty-one GAF scores above 50). The record as a whole does not reflect an overall "improvement" in Carlson's shoulder pain, as argued by the Commissioner. Doc. 13 at 12. To the contrary, extensive documentation in Dr. Kapler's treatment records indicate the length and severity of Carlson's pain, and varied improvement with medication. A treatment note on March 27, 2014, reflects Carlson stated his pain was "uncontrolled," resulting in a plan to begin a fentanyl patch. AR 1096. A treatment note on April 3, 2014, indicates the symptoms of chronic pain were moderate, occurred constantly in the shoulder, and were long-standing and lingering. AR 1087. On April 16, 2014, Carlson reported a burning and sharp pain in the right shoulder that occurred constantly, was "not changing in character," and was aggravated by movements; he also reported only "mild improvement (<50%)" with medications, so Dr. Kapler increased Carlson's morphine dosage. AR 1069. After the treatment notes from April and September 2014 (relied upon by the ALJ), Carlson reported that his "pain is not as well controlled as [he] would like with the morphine," so Dr. Kapler informed him that once he finished that prescription, "we [would] work on an alternative pain medication." AR 967. On October 23, 2014, Carlson reported that his shoulder pain

17

was worsening, that it was not as well controlled as he would like, that it was aggravated by movement, and that there were no relieving factors, while Dr. Kapler noted Carlson's insurance "will not allow a slight increase in [his] pain medication," but there were other medications he could try. AR 1039. On February 5, 2015, Carlson reported pain in his right shoulder that was "aching, burning, sharp, and throbbing" and aggravated by "movement and pushing," and although he reported his pain "is relieved by" pain medications, he "want[ed] to change pain medications." AR 1023. A treatment note on May 8, 2015, indicates Carlson "continues to have pain" in his right shoulder, but the "pain [is] well controlled with current meds." AR 939. On June 5, 2015, however, Carlson indicated his chronic pain symptoms were moderate, occurred daily in the shoulders, and worsen when he feels anxious (AR 929), and on June 26, 2015, he described his pain "as 7/10" (AR 918).

Although the ALJ appears to have relied on two of Dr. Kapler's treatment notes as evidence that Carlson's pain was controlled by medications, those records as a whole show that Carlson never reported a complete absence of shoulder pain and that the extent to which his pain was controlled by medications fluctuated. Therefore, I find that the ALJ erred in assessing Dr. Henderson's opinion and will remand this case to the Social Security Administration for the ALJ to further address why Dr. Henderson's opinion should be given little weight or to adopt additional limitations related to Carlson's right shoulder.[13]

---

[13] I do not believe that remand for an award of benefits is appropriate, as Carlson argues. The ALJ could impose additional limitations related to Carlson's right shoulder, and he still might not be disabled—the VE testimony Carlson relies on to argue otherwise is in response to a question finding him limited to "occasional reaching in all directions with [both] upper extremities," not merely the right extremity. AR 126. I note, however, that I have doubts that based on this record, the ALJ's RFC determination could be supported by substantial evidence if it does not include additional limitations related to Carlson's right shoulder. I will allow the ALJ the opportunity, however, to assess any new evidence on remand and to offer new reasons

18

### *C. VE Hypothetical*

Carlson argues that the ALJ's hypothetical to the VE did not include a limitation reflecting his moderate difficulties in maintaining concentration, persistence, or pace; thus, Carlson argues the VE's testimony does not constitute substantial evidence that he can perform other work. An ALJ bears the burden of proving there are jobs in the national economy the claimant can perform. *See Gieseke v. Colvin*, 770 F.3d. 1186, 1189 (8th Cir. 2014); *Goff v. Barnhart*, 421 F.3d 785, 790 (8th Cir. 2005). "In making this determination, the ALJ may rely on testimony by a VE that is 'based on a correctly phrased hypothetical question that captures the concrete consequences of a claimant's deficiencies.'" *Gieseke*, 770 F.3d at 1189 (quoting *Cox*, 495 F.3d at 620). "[T]he ALJ may exclude any alleged impairments that [the ALJ] . . . properly rejected as untrue or unsubstantiated." *Perkins v. Astrue*, 648 F.3d 892, 902 (8th Cir. 2011) (quoting *Hunt v. Massanari*, 250 F.3d 622, 625 (8th Cir. 2001)). Thus, the ALJ's questions to the vocational expert need only reflect those limitations that the ALJ finds are applicable to claimant. *See Harwood v. Apfel*, 186 F.3d 1039, 1044 (8th Cir. 1999).

At step three, the ALJ found that Carlson has a "moderate limitation in concentration, persistence or pace." AR 34. When determining Carlson's RFC, the ALJ limited Carlson to "simple, routine, repetitive tasks," and the ALJ's hypothetical to the VE also included this language. AR 35, 125. Carlson argues that the limitation to "simple, routine, repetitive tasks" is insufficient to capture the moderate limitations in concentration, persistence, or pace that the ALJ found at step three, relying on cases from

---

for failing to include additional right-shoulder limitations. Accordingly, I decline to address Carlson's argument that the ALJ's RFC determination is not supported by substantial evidence because the ALJ's lifting and reaching limitations are supported only by the state agency consultants' opinions, and not by Dr. Kapler's or Dr. Henderson's opinions. *See* Doc. 12 at 13; *see also* AR 35, 141-42, 172-73, 902, 1158.

courts outside the Eighth Circuit. Doc. 12 at 13-14. I am bound by Eighth Circuit precedent, which forecloses Carlson's argument. *See Howard v. Massanari*, 255 F.3d 577, 581-82 (8th Cir. 2001) (holding that ALJ's "determination that [claimant] often experienced deficiencies of concentration, persistence, or pace" was adequately captured by "the ALJ's hypothetical concerning someone who is capable of doing simple, repetitive, routine tasks").

### III. CONCLUSION

I **reverse** the Commissioner's decision and **remand** this case to the Social Security Administration for further proceedings. Judgment should enter in favor of Carlson.

**IT IS SO ORDERED** this 26th day of September, 2018.

*Kelly K.E. Mahoney*
Kelly K.E. Mahoney
United States Magistrate Judge
Northern District of Iowa